# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 02/21/2019 11:42 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
Case 2:19-cv-02963-MWF-JPR   Document 1-1   Filed 04/17/19   Page 2 of 15   Page ID #:7
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Rafael Ongkeko

Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
F. Lucas Paule (Bar No. 313282)
  lpaule@bakermarquart.com
BAKER MARQUART LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

*Attorneys for Plaintiff* Tony Bobulinski

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TONY BOBULINSKI, an individual,<br><br>Plaintiff,<br>vs.<br><br>ADAM ROSEMAN, an individual; and DOES 1-20,<br><br>Defendants. | Case No.:  19STCV06065<br><br>**COMPLAINT FOR:**<br><br>(1) **FRAUD IN THE INDUCEMENT;**<br>(2) **NEGLIGENT MISREPRESENTATION; AND**<br>(3) **BREACH OF FIDUCIARY DUTY.**<br><br>**DEMAND FOR JURY TRIAL** |

## NATURE OF THIS ACTION

1.      Adam Roseman proclaims on his LinkedIn profile that he gives "everyone the ability to maximize their income potential."  In this case, Roseman maximized his "income potential" by defrauding a long-time business associate, Tony Bobulinski, out of $650,000.

2.      Through a series of material misrepresentations, Roseman convinced Bobulinski to invest $650,000 in China Branding Group ("CBG"), a company Roseman controlled, by pledging various assets as security for Bobulinski's loan.  Pursuant to the terms of the Senior Secured Promissory Note (the "Note") and a corresponding Pledge Agreement, which memorialized the loan, Bobulinski's Note was secured by certain assets owned by CBG, including CBG's "license agreements" and "content library."  Roseman had represented to Bobulinski that those "license agreements" and "content library" were owned by CBG, when in fact, they were owned by a different entity.  Roseman has admitted this under oath.

3.      Roseman's statements were either knowingly false or grossly negligent.  Bobulinski relied on those statements and lost virtually his entire investment.  Bobulinski would not have entered into the Senior Secured Promissory Note or the Pledge Agreement if he had known that CBG did not own the "license agreements" and "content library," as Roseman falsely promised.

4.      Bobulinski now seeks compensation for the damages he has incurred as a result of Roseman's misrepresentations.

## THE PARTIES

5.      Plaintiff Tony Bobulinski is an individual residing in the State of California.

6.      Defendant Adam Roseman is an individual residing, based upon information and belief, in the State of Georgia.

7.      Bobulinski does not presently know the true names and capacities of the defendants sued herein as DOES 1 through 20, and therefore sues those defendants by fictitious names pursuant to *California Code of Civil Procedure* section 474.  Plaintiff will amend this complaint to allege the true identities of DOES 1 through 20 once they have been ascertained.  Plaintiff is informed and believes that each of the defendants sued as DOES 1 through 20 is in some manner responsible for the occurrences, injuries and other damages alleged in this complaint.

8.      Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, each and every defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other defendant and, that in performing or failing to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the other defendants.  Plaintiff is further informed and believes that each defendant, in taking the actions alleged herein and/or ratifying the actions alleged herein, acted within the course and scope of such authority and, at the same time, for their own financial and individual advantage, as well as in the course and scope of such employment, agency and as an alter ego therein.

## JURISDICTION AND VENUE

9.      Jurisdiction is appropriate in this Court because the harm complained of was suffered in the State of California.  The amount in controversy is within the jurisdiction of this Court.

10.     The Court has personal jurisdiction over each of the defendants because the events at issue in this complaint arise out of acts or omissions that took place in California.

11.     Venue is proper in Los Angeles County, pursuant to *Code of Civil Procedure* section 395, because defendant Roseman resides outside this state, upon information and belief, and the acts and transactions giving rise to these causes of action occurred in substantial part in Los Angeles County.

## FACTUAL BACKGROUND

### China Branding Group Limited

12.     Defendant Roseman is the founder and CEO of CBG.  CBG was the parent company of a group of companies operating in China and the USA. The primary business of this group of companies was to provide international live event content, social media content, and non-studio Hollywood and related video content into the Chinese marketplace.

/ / /

/ / /

**Roseman Solicits Bobulinski**

13.     Plaintiff Bobulinski and Roseman have been business associates for over 16 years. Bobulinski invested in a number of Roseman's businesses.  Accordingly, Bobulinski trusted Roseman based on their longstanding professional relationship and close personal friendship.

14.     On or about March 5, 2015, Roseman sent an email to Bobulinski.  The email was intended to provide an update about CBG and to ask for a short-term bridge loan "to allow [CBG] to acquire some additional top licenses that will help increase our value in a sale."  The loan was to be a "a senior secured loan to be paid off in first priority."  The email also stated the following: "Senior secured bridge loan, secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge loan principal and interest secured in first position."

15.     In response, Bobulinski expressed some interest in helping Roseman.  On March 10, 2015, Roseman emailed Bobulinski stating "would there be a bridge structure that would incentivize you to come in and then I would use that structure for all that are participating? Thanks!"

16.     Roseman and Bobulinski then coordinated to meet in person to further discuss CBG and the bridge loan.  In an email on March 20, 2015, Roseman even asked Bobulinski if he would "want to come see the Culver studio."

17.     Roseman and Bobulinski agreed to meet in person on March 25, 2015, at the Peninsula Hotel in Beverly Hills, California.  During this sit-down meeting, Roseman went into further detail explaining CBG's financial difficulties, including CBG's lack of sources of capital, and he discussed CBG's purported assets.  Roseman explained the need for money and asked whether Bobulinski could provide CBG with a loan.  Roseman informed Bobulinski that Roseman would take a loan on whatever terms Bobulinski asked for or needed to move quickly.  This meeting was not uncommon, as Roseman had asked Bobulinski for financial assistance on multiple occasions over the course of their professional relationship.

18.     Bobulinski informed Roseman that in order for him to provide a loan, he would need the loan to be senior secured by all of CBG's assets.  Roseman assured Bobulinski that he would be

senior secured by all of CBG's assets through a pledge agreement.  Roseman outlined CBG's purported assets, including certain studio operations and license agreements.  Roseman stated that those assets were owned by CBG and that they would secure Bobulinski's loan.  On information and belief, those assets included all of CBG's assets in the United States.

19.     Roseman also assured Bobulinski that if CBG failed, Bobulinski would be protected because his note would be senior in order of funding.  Roseman further stated that the law firm Sheppard Mullin, counsel for CBG, would properly document their understanding.

20.     Following the March 25 meeting, and based on Roseman's serial misrepresentations, which Bobulinski had no reason to disbelieve at the time, Bobulinski agreed to lend CBG $500,000.  Over the next few weeks after the meeting, Roseman and Bobulinski negotiated the terms of the loan. Bobulinski ultimately executed a Senior Secured Promissory Note (the "Note") and a Pledge Agreement (the "Pledge") on or about April 15, 2015.  Bobulinski relied on Roseman's statement that Sheppard Mullin would document their understanding and the agreements.

21.     Roseman signed the Note and the Pledge on behalf of CBG.  Section 4 of the Note states: "[CBG's] performance of its obligations hereunder is secured by a first priority security interest in the collateral specified in the Pledge Agreement."  Pursuant to Section 2(a) of the Pledge, the collateral was defined as "all assets (including intangible assets) of [CBG] in the United States, including without limitation its content library, license agreements, and physical assets, such as production equipment" (the "Collateral").  As Roseman later admitted, CBG never owned those assets.

22.     The Pledge was intended to represent and warrant that CBG was the sole and beneficial owner of the Collateral.

23.     Section 5(a) of the Pledge states: "[CBG] represents and warrants as follows… At the time the Collateral becomes subject to the lien and security interest created by this Agreement, [CBG] will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement."

24.     Section 5(c) of the Pledge states: "[CBG] represents and warrants as follows… [CBG] is duly formed and has full power, authority and legal right to…pledge the Collateral pursuant to this Agreement and perform its obligations under this Agreement."

25.     Section 6(b) of the Pledge states: "[CBG] agrees that at any time and from time to time, at the expense of [CBG], [CBG] will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable in order to perfect and protect any security interest granted hereby or to enable [Bobulinski] to exercise and enforce its rights and remedies hereunder, under the Note, or under any other agreement related to any Collateral."

26.     Bobulinski would not have agreed to enter into the loan transaction documented in the Note and the Pledge but for the security of the Collateral.  The Note and Pledge are governed by California law.

27.     Bobulinski was one of eight noteholders who entered into promissory notes with CBG starting in or about April 2015 in order to help CBG meet its working capital requirements.

28.     In February 2016, CBG needed additional cash to meet its payroll costs.  Roseman, again, asked Bobulinski for a loan to CBG.  Bobulinski agreed to provide an additional $150,000 pursuant to a second note, dated February 1, 2016, which provided the same terms as the first Note.

29.     On or about April 11, 2016, Bobulinski signed an amendment to the Note reflecting the increase in the loan amount from $500,000 to $650,000.  Nothing in this amendment was intended to affect either CBG's or Bobulinski's rights or obligations under the Note.

## RAAD Productions LLC

30.     RAAD Productions LLC ("RAAD"), another entity controlled by Roseman, owned certain license agreements and media content.  Roseman was the sole member or manager of RAAD.  Furthermore, RAAD had three shareholders including Tapirdo Enterprises, LLC, which is owned by Roseman's wife and a family trust.

31.     RAAD owned the very license agreements and media content Roseman had purported to pledge in the Note and Pledge.  Those assets were never owned by CBG, although Roseman would later transfer certain RAAD ownership interests to CBG to facilitate CBG's sale.

### Remark Media Inc.'s Purchase of China Branding Group Limited

32.     In the fall of 2015, believing he could facilitate the sale of CBG and realize a return on his investment in CBG, Bobulinski introduced Roseman to Shing Tao, the CEO and Chairman of Remark Media Inc. ("Remark").  Remark was interested in purchasing CBG's business and assets.

33.     Of course, many of the assets Remark sought were not owned by CBG; instead those assets were held by other entities controlled by Roseman, such as RAAD.  To facilitate the sale of CBG to Remark, Roseman transferred a certain ownership interest in RAAD to CBG, although the "license agreements" and "content library" – which Bobulinski still believed CBG owned, and which purportedly secured his loan – were never transferred.

34.     CBG never owned the relevant "license agreements" and "content library" identified under the Collateral, which purportedly secured Bobulinski's Note.  Those assets were owned by RAAD, which later became a subsidiary of CBG.  To be clear, CBG only owned shares of RAAD for a short period of time in order to complete the sale of CBG to Remark, several months after Bobulinski and CBG entered into the Note.

### Cayman Islands Proceedings

35.     Remark's purchase of CBG constituted a "Liquidity Event" under the Note.  Under the terms of the Note, CBG was required to pay Bobulinski the principal of the Note ($650,000) with a 2.5x return upon the close of the sale to Remark for a total of $1,625,000.

36.     Ultimately, the Joint Official Liquidators of CBG rejected Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a balance of $650,000.  This dispute was the basis for a separate legal proceeding in the Grand Court of the Cayman Islands entitled *In the Matter of China Branding Group Limited (In Official Liquidation)*, Cause No. FSD 52 of 2016 (RMJ) (the "Cayman Proceedings").

37.     It was during the Cayman Proceedings that Bobulinski first discovered CBG did not actually own the "license agreements" and "content library," which were supposed to secure his Note.  Bobulinski first discovered Roseman's misrepresentation on or about September 1, 2017 when Mark C. Dosker of Squire Patton Boggs provided a report on behalf of CBG's Joint Official

Liquidators in the Cayman Proceedings analyzing issues under California law. Mr. Dosker reported the following:

> "To the extent that any 'content library', 'license agreements' and/or 'production equipment' existed but were not located 'in the United States' as of the date the JOLs took control of CBG, or were assets of a subsidiary or affiliate of CBG rather than of CBG, they are not within the definition of 'Collateral' and under California law the security interest created by the Pledge Agreement does not apply to such 'content library', 'license agreements' and/or 'production equipment'. Accordingly, a court applying California law would not recognize a security interest in such assets."

38. Mr. Dosker also commented on the Second Amended and Restated Asset and Securities Purchase Agreement by and among China Branding Group Limited (In Official Liquidation) and The Joint Official Liquidators and Seller Management and Target Entities and KanKan Limited and Remark Media, Inc. (the "APA"). The APA was the agreement by which all of CBG's assets and interest in its subsidiaries were sold to Remark. Mr. Dosker reported the following:

> "To the extent, if any, that CBG previously owned any assets in the United States consisting of 'content library', 'license agreements' or 'production equipment', they were sold as part of all the assets sold pursuant to the APA as approved by the Grand Court of the Cayman Islands. The APA does not identify any such assets of CBG in the United States consisting of 'content library', 'license agreements' or 'production equipment'."

This was the first time Bobulinski had heard that the Collateral was not owned by CBG.

39. During the Cayman Proceedings, Roseman later admitted while testifying that BCG did not own the "license agreements" and "content library" referred to as the Collateral when he signed the Note and Pledge on behalf of CBG. The October 3, 2018 transcript from those proceedings reads as follows:

> "**Counsel**: So there is no doubt, is there, that [the Pledge] was intended to create security in favour of Mr Bobulinski.
> **Roseman**: No. There is no doubt in my mind.
> …
> **Counsel**: And the collateral includes specifically [BCG's] content library and licence agreements, doesn't it?
> **Roseman**: That's correct.
> **Counsel**: And it was intended that this document would be an effective pledge over the content library and licence agreements; correct?
> **Roseman**: It was indeed.

> **Counsel**: And the Company represented and warranted that it was the
> sole and beneficial owner of the collateral, didn't it?
> …
> **Roseman**: I believe that's the case but you would need to confirm
> that with counsel. That goes a little beyond me, but I believe that's the
> case.
> …
> **Counsel**: If [BCG] didn't own content library or licence agreements it
> was a misleading statement, wasn't it, to say that it intended to create
> a security interest in those assets.
> **Roseman**: I would guess that's the case, yes.
> …
> **Counsel**: [Section 5(c) of the Pledge is] a representation and a
> warranty that [BCG] had full power, authority and rights to pledge the
> collateral. Do you see that?
> **Roseman**: I do.
> **Counsel**: And again, if the Company didn't own the content library
> and the license agreements, that was also misleading, wasn't it.
> **Roseman**: I would believe so, yes."

40.     During these proceedings, Roseman also admitted that BCG did not act to perfect the

security interest granted by the Pledge to enable Bobulinski to exercise his rights and remedies

under the Pledge.  The October 3, 2018 transcript from those proceedings reads as follows:

> "**Counsel**: Now, the Company took no action to perfect the security
> interest granted by the pledge to enable Mr. Bobulinski to exercise his
> rights and remedies under the pledge, did it?
> **Roseman**: I do not know the answer to that. I would have to consult
> with Shepherd Mullan. None that I can recall.
> **Counsel**: Did you give any instructions to Shepherd Mullan to do so?
> **Roseman**: No. I would have expected that Shepherd Mullan would
> have advised me to whatever actions I would have needed to take. I
> have never entered into a security agreement before, never perfected a
> security interest.
> …
> **Counsel**: Thank you. As far as you are aware, [BCG] didn't take any
> action to protect the security interest granted by the pledge to enable
> Mr. Bobulinski to exercise his rights and remedies under the pledge,
> did it?
> **Roseman**: That's correct…"

## FIRST CAUSE OF ACTION

### (Fraud in the Inducement against all defendants)

41.     Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full

herein.

42.     As described above, Bobulinski entered into the Note because he was led to believe

that the Note was secured by the Collateral.  In his March 5, 2015 email, Roseman explained that a

bridge loan to CBG would be senior secured by "all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City)." Roseman also acted as if those assets were owned by CBG.  For example, Roseman offered to take Bobulinski to "come see the Culver studio" in a March 20, 2015 email when they were discussing a day and time to meet to discuss CBG and the loan.  Roseman also misrepresented that the Collateral was owned by CBG during his March 25, 2015 meeting with Bobulinski, when he explained the purported assets that would secure Bobulinski's loan.  On information and belief, those assets included all of CBG's assets in the United States.  Roseman never explained that those assets were actually owned by RAAD.  Furthermore, during the negotiation discussions for the Note (between March and April 2015), Roseman never clarified that those assets were owned by RAAD.

43.     Use of the terms "license agreements" and "content library" in defining the Collateral also led Bobulinski, at the time he entered into the Note and the Pledge, to believe that it was CBG that owned the referenced "license agreements" and "content library."

44.     Roseman represented and warranted that CBG was the sole and beneficial owner of the Collateral, when in fact, the assets Roseman had promised as security were owned by RAAD. As the sole member or manager of RAAD, Roseman knew or should have known these representations to be false and/or misleading.  RAAD was a separate entity from CBG at the time Bobulinski entered into the Note and CBG never owned RAAD's assets.

45.     Roseman's misrepresentations were essential to Bobulinski's decision to enter into the Note.  Bobulinski informed Roseman that a vital condition to providing a loan was that his loan needed to be senior secured by CBG's assets.  Bobulinski was then led to believe that CBG owned the "content library" and "license agreements" that would secure his loan.  Bobulinski would not have agreed to enter into the Note and the Pledge but for this agreement that the Note would be secured by the Collateral.  In reality, the Collateral, which Roseman led Bobulinski to believe was owned by CBG, was actually owned by RAAD.

46.     Roseman's misrepresentations were made with the intention to induce Bobulinski to enter into the Note and Pledge.

47.     Bobulinski justifiably relied on the misrepresentations in entering into the Note and Pledge.

48.     As an actual and proximate cause of these misrepresentations, Bobulinski has been damaged in an amount to be proven at trial.

49.     Bobulinski is informed and believes, and on that basis alleges, that Roseman engaged in the conduct described above with fraudulent intent, and with a conscious or reckless disregard for Bobulinski's rights and welfare. Roseman thereby acted toward Bobulinski with malice, oppression, and fraud. Accordingly, Bobulinski is entitled to an award of punitive and exemplary damages against Roseman in an amount sufficient to punish and make an example of Roseman and to deter him and others similarly situated from engaging in similar wrongful conduct in the future.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation against all defendants)

50.     Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

51.     As the CEO of CBG, Roseman was or should have been kept apprised of all assets owned by CBG.  And as the sole member or manager of RAAD, Roseman knew or should have known that RAAD and CBG were separate entities and that RAAD owned those "license agreements" and "content library" which Bobulinski was led to believe would secure his Note. Roseman knew or should have known that inclusion of the terms "license agreements" and "content library" within the scope of the Collateral were misleading because those assets were owned by RAAD.

52.     Despite this, Roseman failed to inform Bobulinski of the misrepresentations contained in the Pledge.  Roseman never explained that those assets were owned by RAAD or that RAAD was a separate entity.  Additionally, Roseman had no reasonable grounds for believing the representations were true when he made them.

53.     Bobulinski reasonably relied on such misrepresentations made by Roseman.

54.     As a direct and proximate cause of Roseman's actions, Bobulinski has suffered damages in an amount to be proven at trial.

55.     Bobulinski is informed and believes, and based thereon alleges, Roseman's conduct was performed with a conscious disregard of Bobulinski's rights, such as to constitute oppression, fraud, or malice, thereby rendering Roseman liable for punitive damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty against all defendants)

56.     Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

57.     Roseman was a fiduciary of Bobulinski based on their long-standing professional relationship as business partners.  Bobulinski and Roseman have been business associates for over 16 years.  Bobulinski invested in a number of Roseman's businesses throughout that time period. Roseman's fiduciary duties also arise from his superior knowledge as the CEO and controlling member of CBG.  As Bobulinski's business partner and based on Roseman's superior knowledge, Bobulinski placed his trust and confidence in Roseman.  Therefore, Roseman, in equity and good conscience, was bound to act in good faith and with due regard to Bobulinski's interests.

58.      As Bobulinski's fiduciary, Roseman owed a duty to fully and frankly disclose all relevant information necessary for just, equitable and open dealings between Roseman and Bobulinski.  Roseman failed to fully disclose all material facts within his knowledge to Bobulinski about the Collateral and the purported security of the Note.  Roseman did not explain that the "license agreements" and "content library" which purportedly secured Bobulinski's Note were not actually owned by CBG; rather, they were owned by RAAD.

59.     Roseman knowingly undertook to act on behalf of Bobulinski and with Bobulinski's confidence and trust when he solicited Bobulinski for a loan to CBG.  Roseman abused that trust when he fraudulently misrepresented that CBG owned the Collateral.

60.     As a direct and proximate cause of Roseman's breach of his fiduciary duty, Bobulinski has suffered damages in an amount to be proven at trial.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.      For actual and consequential damages to be proven at trial;

2.      Compensatory damages, in an amount to be proven at trial;

3.      For punitive and exemplary damages;

4.      For costs of suit;

5.      For attorneys' fees as permitted by law; and

6.      For such other and further relief that this Court deems proper.


DATED  February 21, 2019                    BAKER MARQUART LLP


By: _____
                Ryan G. Baker
                Lucas Paule
                *Attorneys for Plaintiff*
                Tony Bobulinski

## DEMAND FOR JURY TRIAL

Plaintiff Tony Bobulinski hereby demands a jury trial of all claims, defenses and requests for relief in this matter for which there is a right to a jury trial.


DATED  February 21, 2019              BAKER MARQUART LLP


By: _____

    Ryan G. Baker
    Lucas Paule
    *Attorneys for Plaintiff*
    Tony Bobulinski