# Exhibit 5

Excerpts of Cayman Transcript



IN THE MATTER OF CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION)

Day 2

October 3, 2018

Opus 2 International - Official Court Reporters

Phone: 0203 008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

Exhibit 5  Page 217

**Page 37**

1  a valid legal and binding obligation of the borrower
2  enforceable against the borrower in accordance with its
3  terms".
4      Correct?
5  A  That is correct, and it continues.
6  Q  It does continue. That's correct. 6.4 refers to the
7  security interest granted to the noteholder; correct?
8  A  I'm just reading it. One moment.
9  Q  Yes. that's fine. The penultimate line. (Pause)
10 A  That's correct.
11 Q  So when you signed this document on behalf of the
12    Company it was clear that you intended that the
13    Company —— Company's obligations under the note —— were
14    intended to be secured by the collateral; correct?
15 A  Absolutely.
16 Q  Will you please turn to page 12?
17 A  Yes?
18 Q  This is the pledge agreement. Do you recall this
19    document?
20 A  I saw this —— I recall the concept of a pledge
21    agreement, and I'm sure if I read this briefly I would
22    be familiar with it, yes.
23 Q  Again, if you turn to page 17 you see that it is signed
24    by you, once again, isn't it, so you caused the Company
25    to enter into this agreement with Mr Bobulinski;

**Page 38**

1  correct?
2  A  That's correct.
3  Q  And back at page 12, under the pledge agreement, it
4    describes the Company as the pledgor; correct?
5  A  Sorry, where are you?
6  Q  At the top of page 12 there is a definition of,
7    "Pledgor".
8  A  Ah. Yes. I do. That's correct.
9  Q  That's the Company, and the secured party is
10    Mr Bobulinski.
11 A  That is correct. That is correct.
12 Q  And then there is a recital which says, "This agreement
13    is given by the pledgor", that is the Company," ... in
14    favour of the secured party", that is Mr Bobulinski,
15    " ... to secure the payment and performance of all the
16    secured obligations"; correct?
17 A  I see that. That's correct.
18 Q  So there is no doubt, is there, that this was intended
19    to create security in favour of Mr Bobulinski.
20 A  No. There is no doubt in my mind.
21 Q  Clause 2 is the —— it is the pledge, and that defines
22    the scope of the collateral. Do you see that?
23 A  I'm just reading it. One moment. (Pause)
24      That's correct.
25 Q  And the collateral includes specifically the Company's

**Page 39**

1    content library and licence agreements, doesn't it?
2  A  That's correct.
3  Q  And it was intended that this document would be an
4    effective pledge over the content library and licence
5    agreements; correct?
6  A  It was indeed.
7  Q  And the Company represented and warranted that it was
8    the sole and beneficial owner of the collateral, didn't
9    it?
10 A  Sole and beneficial owner of the collateral? Can you
11    direct me to that?
12 Q  Yes I can. If you have a look at clause 5(b) on the
13    same page, do you see that?
14 A  It says, "The pledge of the collateral pursuant to this
15    agreement creates a valid first priority security
16    interest in the collateral securing the payment and
17    performance when due of the secured obligations".
18 Q  Yes. so the pledge of the collateral, which includes the
19    content library and the licence agreements, pursuant to
20    this agreement, creates a valid first priority interest
21    in the content library and the licence agreements;
22    correct?
23 A  I believe that's the case but you would need to confirm
24    that with counsel. That goes a little beyond me, but I
25    believe that's the case.

**Page 40**

1  Q  But if the Company didn't own the content library and
2    the license agreements or any, then that was
3    a misleading statement, wasn't it?
4  A  I'm sorry, one more time?
5  Q  If the Company didn't own content library or licence
6    agreements it was a misleading statement, wasn't it, to
7    say that it intended to create a security interest in
8    those assets.
9  A  I would guess that's the case, yes.
10 Q  Look at 5(c).
11 A  Yes.
12 Q  It's a representation and a warranty that the Company
13    had full power, authority and rights to pledge the
14    collateral. Do you see that?
15 A  I do.
16 Q  And again, if the Company didn't own the content library
17    and the license agreements, that was also misleading,
18    wasn't it.
19 A  I would believe so, yes.
20 Q  And these were representations that were made by the
21    Company; correct?
22 A  Correct.
23 Q  Acted by you, correct? You signed the document?
24 A  I signed the document. Correct.
25 Q  And you took care to ensure that there were assets,

Opus 2 International
Official Court Reporters
Exhibit 5
Page 218
transcripts@opus2.com
0203 008 6619

1      content library and license agreement, correct?
2   A  Yeah, we had a significant content library and licence
3      agreements. That's correct.
4   Q  "We", being the Company?
5   A  "We", being the Company. Correct.
6   Q  And also the subsidiaries of the Company, RAAD in
7      particular, had content library and licence agreements,
8      didn't they?
9   A  Correct.
10  Q  In the United States?
11  A  Correct. Absolutely.
12  Q  And the Company's content library and licence agreements
13     were in the United States; correct?
14  A  Most of them would have been, a significant portion at
15     least. Yes.
16  Q  Have a look at clause 6(b) please. Further assurances
17     on page 14. Do you see that?
18  A  I do.
19  Q  I'm just going to read the relevant bits now.
20  A  Okay.
21  Q  "The pledgor agrees ..."
22        That is the Company agrees:
23        " ... at its expense that it will promptly execute
24     and deliver all further instruments and documents and
25     take further action that may be necessary or desirable

41

1      in order to perfect and protect any security interest
2      granted hereby or to enable Mr Bobulinski to exercise
3      and enforce his rights and remedies hereunder".
4         Do you see that?
5   A  I do.
6   Q  Now, the Company took no action to perfect the security
7      interest granted by the pledge to enable Mr Bobulinski
8      to exercise his rights and remedies under the pledge,
9      did it?
10  A  I do not know the answer to that. I would have to
11     consult with Shepherd Mullan. None that I can recall.
12  Q  Did you give any instructions to Shepherd Mullan to do
13     so?
14  A  No. I would have expected that Shepherd Mullan would
15     have advised me to —— whatever actions I would have
16     needed to take. I have never entered into a security
17     agreement before, never perfected a security interest.
18  Q  When you say you have never entered ...
19  A  I mean I have never been involved in securing assets.
20          (Technical problems in Cayman)
21  MR JUSTICE MCMILLAN: ... attempting to do both at the same
22     time.
23  A  I'm back.
24  MR JUSTICE MCMILLAN: Yes Mr Roseman, we have you back.
25  A  Okay. Great. Do you want me to answer your question,

42

1      sir? Yeah, I would have —— this is not an item that I
2      would have familiarity with. I would have expected that
3      a security interest would have been perfected but it's
4      not something that I would have thought of or known what
5      to do without direction from counsel, but it's clear
6      that that was the intention.
7   MR ISAACS: Thank you. As far as you are aware, the Company
8      didn't take any action to protect the security interest
9      granted by the pledge to enable Mr Bobulinski to
10     exercise his rights and remedies under the pledge, did
11     it?
12  A  That's correct. No. I don't have any.
13  Q  And if that's the case that was also a breach of the
14     pledge, wasn't it?
15  A  I would expect so, but that would be a question for
16     counsel in terms of defining a breach. I would have
17     expected it should have occurred. That much I can say.
18  Q  Well, as the chief executive of the Company were you not
19     concerned to ensure that the Company complied with the
20     obligations that you caused it to enter into?
21  A  I was, but I was concerned with about 10,000 other
22     items, and I did rely heavily on counsel to guide me
23     when it came to transactional documents. I would have
24     believed that, as I stated, Mr Bobulinski would have
25     received security interest. That much I can say.

43

1   Q  Yes, but because you were concerned with 10,000 other
2      items, the fact that the pledge appears to have been
3      breached was not something that you were particularly
4      concerned about.
5   A  It's not something that I was even aware of. I would
6      have assumed it would have happened.
7   Q  By itself?
8   A  Yes. By counsel.
9   Q  Because your counsel acts without your instructions and
10     then they go off and do things without being asked to do
11     them?
12  A  Counsel, when it comes to a business agreement,
13     generally points out the items that need to be focused
14     on when entering into an agreement. A CEO does not
15     generally review pledge agreements and instruct counsel
16     to make pledge and security agreements. That is
17     a process that's deferred to counsel.
18  Q  Can we now look at clause 6(c) please?
19  A  Yes.
20  Q  "The pledgor will not, without providing at least five
21     prior —— five days prior written notice to Mr Bobulinski
22     change its corporate structure".
23  A  Yes.
24  Q  Location of its chief executive or its principal place
25     of business.

44