Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
F. Lucas Paule (Bar No. 313282)
  lpaule@bakermarquart.com
BAKER MARQUART LLP
777 S. Figueroa St., Suite 2850
Los Angeles, California 90017
Telephone:  (424) 652-7800
Facsimile:   (424) 652-7850

Attorneys for Plaintiff Tony Bobulinski

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY BOBULINSKI, an individual,<br><br>            Plaintiff,<br><br>      vs.<br><br>ADAM ROSEMAN, an individual; and DOES 1-20,<br><br>            Defendants. | Case No. 2:19-cv-02963-MWF-SSx<br><br>**FIRST AMENDED COMPLAINT**<br><br>**1. FRAUD IN THE INDUCEMENT;**<br>**2. NEGLIGENT MISREPRESENTATION; AND**<br>**3. BREACH OF FIDUCIARY DUTY**<br>DEMAND FOR JURY TRIAL<br><br>The Hon. Michael W. Fitzgerald<br>Courtroom:  5A |

FIRST AMENDED COMPLAINT

## **NATURE OF THIS ACTION**

1.      Adam Roseman proclaims on social media that he gives "everyone the ability to maximize their income potential."  But unlike so many others on social media, who perhaps innocently project a false reality to their "followers" or "friends," Roseman's deception was not limited to the virtual world, nor was his deception innocent.  In this case, Roseman's misrepresentations cost Tony Bobulinski, a long-time (former) business associate and friend, well over $1.5 million.

2.      Through a series of material misrepresentations, Roseman convinced Bobulinski to invest a total of $650,000 in China Branding Group ("CBG"), a company Roseman controlled, by pledging various assets as security for Bobulinski's loan.  Pursuant to the terms of the Senior Secured Promissory Note (the "Note") and a corresponding Pledge Agreement (the "Pledge Agreement"), which memorialized the security interest, Bobulinski's Note was secured by assets purportedly owned by CBG, including CBG's "content library, license agreements, and physical assets, such as production equipment" in the United States (collectively, the "Collateral").

3.      Roseman represented to Bobulinski that the Collateral was owned by CBG.  But it was not.  In fact, it was owned by RAAD Productions LLC ("RAAD"), a completely separate entity from CBG which was not affiliated with CBG in any way.  Roseman, who controlled RAAD, later admitted this under oath.

4.      Roseman also promised Bobulinski that his Note would be senior secured by the Collateral, which meant that Bobulinski's loan was to be "paid off in first priority." Roseman assured Bobulinski that if CBG failed, Bobulinski would be protected because his note would be senior in order of funding

5.      Bobulinski would not have entered into the Senior Secured Promissory Note or the Pledge Agreement if he had known that CBG did not own the Collateral or that his Note would not be senior secured by the Collateral, as Roseman falsely promised.  In reality, there was nothing to secure Bobulinski's *Senior Secured* Note.

This was also significant, because Bobulinski had planned to use the cash he invested in CBG for a different investment opportunity.  Based on Roseman's representations, Bobulinski was assured his CBG investment would be returned in time for Bobulinski to make the other investment.

6.     The gig was up shortly after Bobulinski entered into the Note.  On April 28, 2016, CBG's largest creditor presented a creditor's winding up petition against CBG because CBG continued to face financial difficulties.  The petition was submitted to the Grand Court of the Cayman Islands (the "Cayman Court") as CBG is a company incorporated in the Cayman Islands.  The Joint Official Liquidators of CBG (the "JOLs") were appointed pursuant to an August 28, 2016 winding up order issued by the Cayman Court.  Thereafter, on September 20, 2016, CBG entered into an agreement, to sell all of its assets to another company, Remark Media Inc. ("Remark").

7.     Based on his belief that he was a senior secured creditor of CBG, whose loan was secured by the Collateral, Bobulinski submitted a Proof of Debt to the JOLs during CBG's liquidation proceedings in the Cayman Islands (the "Cayman Liquidation") for a total of $1,625,000, which included the principal Note amount plus a 2.5x multiplier, as required by the Note and which Roseman promised Bobulinski would receive.

8.     Ultimately, the JOLs rejected Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a balance of the principal $650,000 and that he was not senior secured because CBG did not own the Collateral.  This dispute was the basis for a separate legal proceeding in the Grand Court of the Cayman Islands entitled *In the Matter of China Branding Group Limited (In Official Liquidation)*, Cause No. FSD 52 of 2016 (RMJ) (the "Cayman Litigation").

9.     The Cayman Litigation took nearly two and a half years.  Bobulinski litigated under the belief that he was a senior secured creditor with a security interest in the Collateral.  During this time, these difficult legal proceedings consumed

FIRST AMENDED COMPLAINT

Bobulinski's life, but it was through these proceedings that Bobulinski ultimately discovered the truth about the security interest in his investment – he learned he had been duped. Ultimately, the Cayman Court accepted the JOLs' argument that CBG never owned the Collateral and that those assets were actually owned by RAAD – contrary to everything Roseman promised in order to induce Roseman to enter into the Note. Therefore, the Cayman Court found that Bobulinski never had a security interest in the Collateral. Roseman's deception had not only cost Bobulinski the timely return of any funds invested, it also caused Bobulinski to waste thousands of hours over two and a half years fighting to enforce Roseman's false promises.

10.    Bobulinski incurred significant damages as a result of Roseman's lies. Bobulinski has recovered nothing on his $650,000 loan. As explicitly provided in the Note, and as falsely promised by Roseman, Bobulinski was owed the principal amount of his loan plus a 2.5x return, for a total of $1,625,000, which should have been paid on or before the sale of CBG to Remark. Instead of receiving the promised payout, Bobulinski was forced to spend well over $700,000[1] litigating in the Cayman Islands, in a vain attempt to obtain the benefits Roseman had promised. Litigating in the Cayman Islands was not only taxing on Bobulinski's wallet, he also suffered significant emotional distress. Unable to recover anything from his loan, Bobulinski was unable to utilize the significant capital he thought he had temporarily loaned CBG.

11.    Bobulinski now seeks compensation for the damages he has incurred as a result of Roseman's misrepresentations, which amount to well over $1.5 million, and to finally hold Roseman accountable for the distress he has caused.

## **THE PARTIES**

12.    Plaintiff Tony Bobulinski is an individual residing in the State of California.

---

[1] On top of his own legal fees, the JOLs are now claiming that Bobulinski must pay their legal fees amounting to $634,393.52.

FIRST AMENDED COMPLAINT

13.     Defendant Adam Roseman is an individual residing, based upon information and belief, in the State of Georgia.

14.     Bobulinski does not presently know the true names and capacities of the defendants sued herein as DOES 1 through 20, and therefore sues those defendants by fictitious names.  Plaintiff will amend this complaint to allege the true identities of DOES 1 through 20 once they have been ascertained.  Plaintiff is informed and believes that each of the defendants sued as DOES 1 through 20 is in some manner responsible for the occurrences, injuries and other damages alleged in this complaint.

15.     Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, each and every defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other defendant and, that in performing or failing to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the other defendants.  Plaintiff is further informed and believes that each defendant, in taking the actions alleged herein and/or ratifying the actions alleged herein, acted within the course and scope of such authority and, at the same time, for their own financial and individual advantage, as well as in the course and scope of such employment, agency and as an alter ego therein.

## JURISDICTION AND VENUE

16.     Plaintiff originally filed this complaint in the Superior Court of the State of California for the County of Los Angeles on February 21, 2019.  On April 17, 2019, Defendant Roseman removed this action to the United States District Court for the Central District of California on the basis of diversity of citizenship under 28 U.S.C. §§ 1332(a), 1441, and 1446.

17.     The diversity requirement of section 1332 is satisfied in this action because the matter in controversy is "between citizens of different States." 28 U.S.C.

FIRST AMENDED COMPLAINT

§ 1332(a)(1).  The citizenship of the fictitiously named defendants sued as DOES 1 through 20 is disregarded for purposes of the diversity requirement because this case was removed from California state court.  28 U.S.C. § 1441(b)(1).  The amount-in-controversy requirement of section 1332 is satisfied in this action because Plaintiff is seeking to recover a sum that "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1).  Venue is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district.

18.     The Court has personal jurisdiction over Roseman because Roseman has availed himself of this Court, removing this action from California State Court on or about April 17, 2019 pursuant to 28 U.S.C. § 1441.  Moreover, Defendant has engaged in business activities in, and directed to, the State of California and have committed tortious acts within the state.  Defendant has purposefully availed himself of the opportunity to conduct commercial activities in this forum, and this Complaint arises out of those activities.

## FACTUAL BACKGROUND

### China Branding Group Limited

19.     Defendant Roseman is the founder and CEO of CBG.  CBG is a company incorporated in the Cayman Islands.  CBG was the parent company of a group of companies operating in China and the USA. The primary business of this group of companies was to provide international live event content, social media content, and non-studio Hollywood and related video content into the Chinese marketplace.

### Roseman Solicits Bobulinski

20.     Plaintiff Bobulinski and Roseman have been business associates for over 16 years.  Bobulinski invested in a number of Roseman's businesses.  Accordingly, Bobulinski trusted Roseman based on their longstanding professional relationship and close personal friendship.

FIRST AMENDED COMPLAINT

21.    In or around 2015, CBG was running out of money.  CBG suffered significant cashflow difficulties from its inception as a result of the need to find working capital to fund its growth.  As a result, Roseman urgently sought further funding, and was looking for ways to quickly infuse funding into the company.

22.    On or about March 5, 2015, Roseman sent an email to Bobulinski.  The email was intended to provide an update about CBG and to ask for a short-term bridge loan "to allow [CBG] to acquire some additional top licenses that will help increase our value in a sale."  The loan was to be a "a senior secured loan to be paid off in first priority."  The email also stated the following: "Senior secured bridge loan, secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge loan principal and interest secured in first position."

23.    In response, Bobulinski expressed some interest in helping Roseman.  Consequently, Roseman followed up on March 10, 2015, when he emailed Bobulinski stating "would there be a bridge structure that would incentivize you to come in and then I would use that structure for all that are participating? Thanks!"

24.    Roseman and Bobulinski then coordinated to meet in person to further discuss CBG and the bridge loan.  In an email on March 20, 2015, Roseman even asked Bobulinski if he would "want to come see the Culver studio."

25.    Roseman and Bobulinski agreed to meet in person on March 25, 2015, at the Peninsula Hotel in Beverly Hills, California.  During this sit-down meeting, Roseman went into further detail explaining CBG's financial difficulties, including CBG's lack of sources of capital, and he discussed CBG's purported assets. Roseman explained the company's desperate need for money and asked whether Bobulinski could provide CBG with a loan.  Roseman informed Bobulinski that Roseman would take a loan on whatever terms Bobulinski asked for or needed in order to move quickly.  Neither the meeting nor the request was uncommon, as Roseman had asked Bobulinski for financial assistance on multiple occasions over

FIRST AMENDED COMPLAINT

1   the course of their professional relationship. Therefore, Bobulinski did not have any

2   reason to believe Roseman's representations during this meeting about CBG or its

3   assets were untrue.

4       26.     Bobulinski informed Roseman that in order for him to provide a loan, he

5   would need the loan to be senior secured by all of CBG's assets. Roseman assured

6   Bobulinski that any loan he provided would be senior secured by all of CBG's assets

7   through a pledge agreement. Roseman outlined CBG's purported assets, including

8   certain studio operations and license agreements. Roseman stated that those assets

9   were owned by CBG and would secure Bobulinski's loan. On information and

10  belief, those assets included all of CBG's assets in the United States.

11      27.     Roseman also assured Bobulinski that if CBG failed, Bobulinski would

12  be protected because his note would be senior in order of funding. Desperate for

13  funding and wanting to move quickly, Roseman assured Bobulinski that their

14  understanding would be properly documented by the law firm Sheppard Mullin,

15  counsel for CBG. In fact, Roseman recommended against Bobulinski retaining

16  separate counsel, as Roseman felt it would slow down the process of obtaining

17  Bobulinski's loan. Roseman assured Bobulinski that Sheppard Mullin would

18  properly document the deal with both of their interests in mind. Again, because

19  Bobulinski trusted his longtime friend and business partner, and because Roseman

20  expressed an urgency in obtaining the loan, Bobulinski did not secure his own

21  separate counsel to negotiate or review the terms of the purported security interest in

22  CBG's assets.

23      28.     Following the March 25 meeting, and based on Roseman's serial

24  misrepresentations, which Bobulinski had no reason to disbelieve at the time,

25  Bobulinski agreed to lend CBG $500,000. Over the next few weeks after the

26  meeting, Roseman and Bobulinski negotiated the terms of the loan. Roseman

27  assured Bobulinski that his security interest would encompass all of CBG's assets in

28  the United States.

FIRST AMENDED COMPLAINT

**The Senior Secured Promissory Note and Pledge Agreement**

29.     Bobulinski ultimately executed a Senior Secured Promissory Note (the "Note") and a Pledge Agreement (the "Pledge Agreement") on or about April 15, 2015.  Roseman signed both documents on behalf of CBG.  True and correct copies of the Note and Pledge Agreement are attached as Exhibits 1 and 2, respectively. Bobulinski would not have agreed to enter into the Note, or at the very least, would have sought alternate terms if he knew that CBG did not actually own the Collateral and if he had full knowledge of what assets CBG owned at the time he entered into the agreements, especially because this would affect his senior security interest. Bobulinski relied on Roseman's statement that Sheppard Mullin would document their understanding and the agreements and did not retain his own counsel before executing the Note or the Pledge Agreement.

30.     Roseman signed the Note and the Pledge Agreement on behalf of CBG. Section 4 of the Note states: "[CBG's] performance of its obligations hereunder is secured by a first priority security interest in the collateral specified in the Pledge Agreement."  Pursuant to Section 2(a) of the Pledge Agreement, the collateral was defined as "all assets (including intangible assets) of [CBG] in the United States, including without limitation its content library, license agreements, and physical assets, such as production equipment" (the "Collateral")."  As Roseman later admitted, CBG never owned those assets.

31.     The Pledge Agreement was intended to represent and warrant that CBG was the sole and beneficial owner of the Collateral.

32.     Section 5(a) of the Pledge Agreement states: "[CBG] represents and warrants as follows… At the time the Collateral becomes subject to the lien and security interest created by this Agreement, [CBG] will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement."

33.    Section 5(c) of the Pledge Agreement states: "[CBG] represents and warrants as follows… [CBG] is duly formed and has full power, authority and legal right to…pledge the Collateral pursuant to this Agreement and perform its obligations under this Agreement."

34.    Section 6(b) of the Pledge Agreement states: "[CBG] agrees that at any time and from time to time, at the expense of [CBG], [CBG] will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable in order to perfect and protect any security interest granted hereby or to enable [Bobulinski] to exercise and enforce its rights and remedies hereunder, under the Note, or under any other agreement related to any Collateral."

35.    Section 7 of the Pledge Agreement states: "[CBG] agrees that it will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, Lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for herein or with the prior written consent of [Bobulinski], which may be granted or withheld in its sole and absolute discretion."

36.    Bobulinski would not have agreed to enter into the loan transaction documented in the Note and the Pledge Agreement but for his understanding of the assets comprising the Collateral at the time he entered into the agreements, April 15, 2015, as misrepresented by Roseman up to that point.  The Note and Pledge Agreement are governed by California law.

37.    Bobulinski was one of eight noteholders (the "Noteholders") who entered into promissory notes with CBG starting in or about April 2015 in order to help CBG meet its working capital requirements.

FIRST AMENDED COMPLAINT

38.     In February 2016, CBG needed additional cash to meet its payroll costs. Roseman, again, asked Bobulinski for a loan to CBG.  Bobulinski agreed to provide an additional $150,000 pursuant to a second note, dated February 1, 2016, which provided the same terms as the first Note.

39.     On or about April 11, 2016, Bobulinski signed an amendment to the Note reflecting the increase in the loan amount from $500,000 to $650,000.  Nothing in this amendment was intended to affect either CBG's or Bobulinski's rights or obligations under the Note or the Pledge Agreement.

### RAAD Productions LLC

40.     RAAD Productions LLC ("RAAD"), another entity controlled by Roseman, owned certain license agreements and media content.  Roseman was the sole member or manager of RAAD.  Furthermore, RAAD had three shareholders including Tapirdo Enterprises, LLC, which is owned by Roseman's wife and a family trust.  Before September 19, 2016, RAAD was a completely separate entity from CBG and was not affiliated with CBG in any way.

41.     RAAD owned the very license agreements and media content Roseman had purported to pledge in the Note and Pledge Agreement.  In other words, at the time Bobulinski entered into the Pledge Agreement, the Collateral was owned by RAAD, not CBG.  Those assets were never owned by CBG, although Roseman would later transfer certain RAAD ownership interests to CBG to facilitate CBG's sale.

42.     Bobulinski was not aware of the existence of RAAD or its ownership of the Collateral that purportedly secured his Note until long after Bobulinski entered into the Note and Pledge Agreement.  Had Roseman made Bobulinski aware that the Collateral was owned by RAAD and not CBG, Bobulinski would not have entered into the Note.  At all times during Roseman's solicitation of Bobulinski and during the negotiation of the Note and Pledge Agreement, Roseman never mentioned RAAD and acted as if the Collateral was owned by one company, CBG.

### **Remark Media Inc.'s Purchase of China Branding Group Limited**

43.    After Bobulinski entered into the Note and Pledge Agreement, Roseman continued to represent to him that the Collateral was owned by CBG and not by RAAD.  Not once did Roseman even mention RAAD.

44.    In the fall of 2015, believing he could facilitate the sale of CBG and realize a return on his investment in CBG, Bobulinski introduced Roseman to Shing Tao, the CEO and Chairman of Remark Media Inc. ("Remark").  Remark initially had minimal interest in purchasing CBG believing the company had little value. Again, Roseman misrepresented to Bobulinski what assets CBG owned, including the Collateral, in order to get Bobulinski to assist in increasing Remark's interest in CBG.  For example, in emails on October 9, 2015 and November 5, 2015, Roseman continued to explain to Bobulinski purported CBG deals and assets.  Again, at no point did he mention RAAD.  Ultimately, with Bobulinski's assistance, Remark was convinced to purchase CBG's business and assets.

45.    Of course, many of the assets Remark sought were not owned by CBG; instead those assets were held by other entities controlled by Roseman, such as RAAD.  To facilitate the sale of CBG to Remark, CBG needed to ensure that those assets owned by RAAD would ultimately be transferred to Remark.

46.    On April 28, 2016, with CBG facing financial difficulties, CBG's largest creditor presented a creditor's winding up petition against CBG.  The petition was submitted to the Grand Court of the Cayman Islands (the "Cayman Court") as CBG is a company incorporated in the Cayman Islands.  Ultimately, the Joint Official Liquidators of CBG (the "JOLs") were appointed to begin the liquidation process (the "Cayman Liquidation") pursuant to a winding up order dated August 28, 2016 issued in the Cayman Islands.

47.    On September 20, 2016 CBG entered into an agreement to sell all of its assets to Remark.  It was a condition precedent to that agreement for all of CBG's Noteholders to enter into respective distribution agreements (the "Distribution

FIRST AMENDED COMPLAINT

Agreements"), which would subordinate their claims to CBG's general body of unsecured creditors. The Distribution Agreements also had the result of negating the pledge agreements of all Noteholders, which all included the same Section 7 as Bobulinski's Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent. All the Noteholders signed their Distribution Agreements, except one – Bobulinski. Therefore, Bobulinski's Pledge Agreement remained effective, and Bobulinski had the contractual right to stop any deal by CBG to transfer its assets.

48.     Despite this, CBG pushed for the deal with Remark to close. Roseman transferred a certain ownership interest in RAAD to CBG on or about September 19, 2016, although the Collateral – which Bobulinski still believed CBG owned, and which purportedly secured his loan – were never transferred. Furthermore, this deal occurred over a year after Bobulinski first entered into the Pledge Agreement.

49.     CBG never owned the Collateral, which purportedly secured Bobulinski's Note. Those assets were owned by RAAD, which later became a subsidiary of CBG for one day. To be clear, CBG only owned shares of RAAD for a short period of time in order to complete the sale of CBG to Remark, over a year after Bobulinski and CBG entered into the Note and Pledge.

### Cayman Litigation

50.     Remark's purchase of CBG constituted a "Liquidity Event" under the Note. Under the terms of the Note, and as promised by Roseman, CBG was required to pay Bobulinski the principal of the Note ($650,000) with a 2.5x return upon the close of the sale to Remark for a total of $1,625,000.

51.     Based on his belief that he was a senior secured creditor of CBG, whose loan was secured by the Collateral, and because he never signed his Distribution Agreement, Bobulinski submitted a Proof of Debt to the JOLs during the Cayman Liquidation for a total of $1,625,000, which included the principal Note amount plus a 2.5x multiplier, as Roseman promised. Ultimately, the JOLs of CBG rejected

FIRST AMENDED COMPLAINT

Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a balance of the

principal $650,000 and concluding that Bobulinski's Note was not secured by the

Collateral.  This dispute was the basis for a separate legal proceeding in the Grand

Court of the Cayman Islands entitled *In the Matter of China Branding Group Limited*

*(In Official Liquidation)*, Cause No. FSD 52 of 2016 (RMJ) (the "Cayman

Litigation").

52.    It was during the Cayman Litigation that Bobulinski first discovered

CBG did not actually own the Collateral, which was supposed to secure his Note.

Bobulinski first discovered Roseman's misrepresentation on or about September 1,

2017 when Mark C. Dosker of Squire Patton Boggs provided a report on behalf of

the JOLs in the Cayman Litigation analyzing issues under California law.  Mr.

Dosker reported the following:

> "To the extent that any 'content library', 'license
> agreements' and/or 'production equipment' existed but
> were not located 'in the United States' as of the date the
> JOLs took control of CBG, or were assets of a subsidiary or
> affiliate of CBG rather than of CBG, they are not within the
> definition of 'Collateral' and under California law the
> security interest created by the Pledge Agreement does not
> apply to such 'content library', 'license agreements' and/or
> 'production equipment'. Accordingly, a court applying
> California law would not recognize a security interest in
> such assets." (*See* Cayman Judgment ¶ 108, a true and
> correct copy of which is attached as Exhibit 4).

53.    Mr. Dosker also commented on the Second Amended and Restated

Asset and Securities Purchase Agreement by and among China Branding Group

Limited (In Official Liquidation) and The Joint Official Liquidators and Seller

Management and Target Entities and KanKan Limited and Remark Media, Inc. (the

"APA").  The APA was the agreement by which all of CBG's assets and interest in

its subsidiaries were sold to Remark.  Mr. Dosker reported the following:

> "To the extent, if any, that CBG previously owned any
> assets in the United States consisting of 'content library',
> 'license agreements' or 'production equipment', they were
> sold as part of all the assets sold pursuant to the APA as
> approved by the Grand Court of the Cayman Islands.  The
> APA does not identify any such assets of CBG in the

13

United States consisting of 'content library', 'license agreements' or 'production equipment'."; and

"[T]he Pledge Agreement clearly states that what is pledged are assets of CBG – not assets of any subsidiary of CBG. And paragraph 4 of the First Affidavit of Shing Tao, dated September 24, 2018, confirms that as of the closing date of the APA transaction, CBG did not own any license agreements or media content (which Shing Tao thinks are synonymous with the phrases "content library" and "license agreements" used in the Pledge Agreement). Since CBG did not own those, they are not within the scope of the pledge in the Pledge Agreement."

(Cayman Judgment ¶ 113)

This was the first time Bobulinski learned that the Collateral was not owned by CBG.

54.    In sum, the JOLs argued that CBG never owned the Collateral. Rather, they were owned by RAAD.  This argument also served as the basis for why CBG did not breach Section 7 of Bobulinski's Pledge Agreement requiring his consent before CBG could transfer its assets to Remark.  The JOLs justified closing the Remark transaction without Bobulinski's approval and signature by arguing that CBG had simply transferred shares of RAAD and had not transferred the assets comprising the Collateral.  Roseman provided support for this argument as well. (*See*, *e.g.*, Cayman Judgment ¶ 222 ("The JOLs emphasise that Mr. Roseman's evidence on this point was that the United States content was owned by RAAD.").)

55.    During the Cayman Litigation, Roseman later admitted while testifying that CBG did not own the Collateral when he signed the Note and Pledge on behalf of CBG.  The October 3, 2018 transcript from those proceedings reads as follows:

"**Counsel**: So there is no doubt, is there, that [the Pledge] was intended to create security in favour of Mr Bobulinski.
**Roseman**: No. There is no doubt in my mind.
…
**Counsel**: And the collateral includes specifically [CBG's] content library and licence agreements, doesn't it?
**Roseman**: That's correct.
**Counsel**: And it was intended that this document would be an effective pledge over the content library and licence agreements; correct?
**Roseman**: It was indeed.

FIRST AMENDED COMPLAINT

**Counsel**: And the Company represented and warranted that it was the sole and beneficial owner of the collateral, didn't it?

...

**Roseman**: I believe that's the case but you would need to confirm that with counsel. That goes a little beyond me, but I believe that's the case.

...

**Counsel**: If [CBG] didn't own content library or licence agreements it was a misleading statement, wasn't it, to say that it intended to create a security interest in those assets.

**Roseman**: I would guess that's the case, yes.

...

**Counsel**: [Section 5(c) of the Pledge is] a representation and a warranty that [CBG] had full power, authority and rights to pledge the collateral. Do you see that?

**Roseman**: I do.

**Counsel**: And again, if the Company didn't own the content library and the license agreements, that was also misleading, wasn't it.

**Roseman**: I would believe so, yes."

56.    During these proceedings, Roseman also admitted that CBG did not act to perfect the security interest granted by the Pledge to enable Bobulinski to exercise his rights and remedies under the Pledge. The October 3, 2018 transcript from those proceedings reads as follows:

"**Counsel**: Now, the Company took no action to perfect the security interest granted by the pledge to enable Mr. Bobulinski to exercise his rights and remedies under the pledge, did it?

**Roseman**: I do not know the answer to that. I would have to consult with Shepherd Mullan. None that I can recall.

**Counsel**: Did you give any instructions to Shepherd Mullan to do so?

**Roseman**: No. I would have expected that Shepherd Mullan would have advised me to whatever actions I would have needed to take. I have never entered into a security agreement before, never perfected a security interest.

...

**Counsel**: Thank you. As far as you are aware, [CBG] didn't take any action to protect the security interest granted by the pledge to enable Mr. Bobulinski to exercise his rights and remedies under the pledge, did it?

**Roseman**: That's correct…"

A true and correct copy of Roseman's October 3, 2018 transcript is attached as Exhibit 3.

57.     While Roseman also testified that CBG's content library and license agreements were in the United States, he failed to distinguish which "content library and license agreements" in the U.S. belonged to RAAD as opposed to CBG.  At a minimum, Roseman continued to conflate the two entities, as he did with Bobulinski, failing to distinguish between the two companies.

58.     Bobulinski's counsel later questioned Roseman about whether CBG's sale of assets to Remark constituted a breach of section 7 of the Pledge.  Of note, Roseman's Cayman counsel, objected to the questioning and commented:

> "**Mr. Smith**: I'm sorry, I intervene because [Bobulinski's counsel] is confusing here the license agreement and the media content with what was actually sold to Remark, which is what we have been previously which is the shares in the subsidiaries and the intercompany receivables. The two are quite different. They are being completely conflated here, and in my submission the witness is being misled in a quite unfair way
> …
> **Mr. Smith**: My Lord, to be clear, my point isn't that the witness doesn't understand the question. It's that the question is misleading because he put to the witness that what was being sold to Remark was the media content, the license agreements and so on. We know that isn't the case. My learned friend is putting a question on a wholly misleading and incorrect basis."

59.     Ultimately, the Cayman Court accepted the JOLs' argument that CBG never owned the Collateral and therefore Bobulinski never had a security interest in the Collateral.  The Cayman Court issued a judgment (the "Cayman Judgment"), rejecting Bobulinski's appeal on January 23, 2019, which agreed with the arguments made by the JOLs.  Specifically, the Cayman Court held:

> "…there is no evidence that the Company had any assets falling within the operative part of the definition of Collateral in the Pledge, i.e., content library, license agreements, and physical assets such as production equipment in the United States. Instead, the JOLs maintain that the Company carries on business as au investment company. It was a parent company for the Group. As such, the Company had relatively few assets.
> …
> …in fact, there is no evidence that the Pledge attached to any assets of the Company, But, even if had attached to any "content library, licence agreement, and physical assets such

FIRST AMENDED COMPLAINT

as production equipment" of the Company in the United States, there is nothing to suggest that the proceeds of sale received under the APA are the identifiable proceeds of such assets. On the contrary, the proceeds of sale received under the APA were, if anything, attributable to the shares in the subsidiary companies being sold under the APA…these assets were never located in the United States and, on any view, fall outside the scope of the Pledge." (*See* Cayman Judgment ¶¶ 221, 230, 232).

60.     The end result was that Bobulinski was unable to recover the 2.5x return Roseman led him to believe he was entitled to.  Bobulinski has also been left duped and confused about what he was led to believe was a security interest in the Collateral.

## **Bobulinski's Earmarked Funds**

61.     Bobulinski had originally earmarked the money he used for the $650,000 Note to fund another company ("Investment Company")[2].  Bobulinski was part of an investment group (the "Purchasing Group") who planned to buy Investment Company in 2017.  Bobulinski had earmarked $2.5 million as his share of the Purchasing Group's investment, which was then reduced by the money he used to fund the Note for CBG, which Bobulinski entered into because of Roseman's misrepresentations.  Because he believed he was receiving a 2.5x return on his $650,000 Note, he also intended for his 2.5x return to be put into Investment Company to increase his investment share.

62.     The Purchasing Group ultimately bought Investment Company in 2017. Following the Cayman Litigation, Bobulinski has been unable to recoup the $650,000 principle amount on his Note or collect the 2.5x return.  Furthermore, he has spent additional money out of his own pocket in legal fees during the Cayman Litigation.  These amounts were all supposed to be included in Bobulinski's total investment in Investment Company, originally at the amount of $2.5 million, which was specifically carved out and allocated to him as his share of Purchasing Group's

---

[2] The actual name of Investment Company is being kept anonymous to protect the privacy of the company.

FIRST AMENDED COMPLAINT

1   total investment.  When Bobulinski could not recoup the amounts he was owed from
2   CBG, Purchasing Group was forced to reallocate part of his share to other
3   individuals.

4   63.    Since 2017, Investment Company has continued to rise in value.
5   Because Bobulinski was forced to reduce his original intended investment,
6   Bobulinski lost out on the opportunity to obtain a much more valuable share of
7   Purchasing Group's investment.

8   **FIRST CAUSE OF ACTION**

9   **(Fraud in the Inducement against all defendants)**

10   64.    Bobulinski repeats and re-alleges each preceding paragraph as if set
11   forth in full herein.

12   65.    As described above, Bobulinski entered into the Note because Roseman
13   led him to believe that the Note was secured by the Collateral.  In his March 5, 2015
14   email, Roseman explained that a bridge loan to CBG would be senior secured by "all
15   our assets (content licenses, our production library and our fixed production
16   equipment in our 10k square foot studio in Culver City)."  Roseman also acted as if
17   those assets were owned by CBG.  For example, Roseman offered to have
18   Bobulinski "come see the Culver studio" in a March 20, 2015 email when they were
19   discussing a day and time to meet to discuss CBG and the loan.  Roseman also
20   misrepresented that the Collateral was owned by CBG during his March 25, 2015
21   meeting with Bobulinski, when he explained the purported assets that would secure
22   Bobulinski's loan.  On information and belief, those assets included all of CBG's
23   assets in the United States.  Roseman never explained that those assets were actually
24   owned by RAAD.  Furthermore, during the negotiation discussions for the Note
25   (between March and April 2015), Roseman never clarified that those assets were
26   owned by RAAD.  In fact, at all times during Roseman's solicitation of Bobulinski
27   and during the negotiation of the Note and Pledge, Roseman never mentioned RAAD
28   and acted as if the Collateral was owned by one company, CBG.

18

FIRST AMENDED COMPLAINT

66.   Use of the terms "license agreements," "content library," and "physical assets" in defining the Collateral  in the Note and Pledge Agreement also led Bobulinski, at the time he entered into the Note and the Pledge Agreement, to believe that it was CBG that owned the referenced "license agreements" and "content library" because the Pledge stated that they were assets of CBG.

67.   Roseman represented and warranted to Bobulinski that CBG was the sole and beneficial owner of the Collateral, when in fact, the assets Roseman promised as security were owned by RAAD.  As the sole member or manager of RAAD, Roseman knew or should have known these representations to be false and/or misleading.  RAAD was a separate entity from CBG at the time Bobulinski entered into the Note and CBG never owned RAAD's assets.

68.   Roseman's misrepresentations were essential to Bobulinski's decision to enter into the Note and Pledge Agreement.  Bobulinski informed Roseman that a vital condition to providing a loan was that his loan needed to be senior secured by CBG's assets.  Bobulinski was then led to believe that CBG owned the Collateral that would secure his loan.  Bobulinski would not have agreed to enter into the Note and the Pledge but for this agreement that the Note would be secured by the Collateral.  In reality, the Collateral, which Roseman led Bobulinski to believe was owned by CBG, was actually owned by RAAD.

69.   Roseman's misrepresentations were made with the intention to induce Bobulinski to enter into the Note and Pledge Agreement, as evidenced by his stated need to secure funding for CBG.

70.   Bobulinski justifiably relied on the misrepresentations in entering into the Note and Pledge Agreement.  Bobulinski and Roseman had been business partners and friends for over 16 years.  And because Roseman was the CEO and founder of CBG, Bobulinski had no reason to believe that Roseman's misrepresentations about the ownership of the Collateral were untrue.

71.    Roseman's misrepresentations about the Collateral are the actual and proximate cause of these damages because had Roseman been truthful about the true ownership of the Collateral, Bobulinski would not have entered into the Note and Pledge Agreement.  And had Bobulinski not entered into the Note and Pledge Agreement, there would have been no need for the Cayman Litigation on Bobulinski's Proof of Debt.  Furthermore, if Bobulinski's Note had actually been secured by the Collateral, he would have had the contractual right to stop the Remark deal, as the deal could not have closed without his signature, pursuant to Section 7 of the Pledge Agreement.  With this veto power, Bobulinski could have held up the Remark deal and received further assurance and confirmation that he was getting his 2.5x return on the Note before the deal closed, which also would have rendered the Cayman Litigation unnecessary.  As it turned out, the Remark deal closed without his consent because CBG did not own the Collateral, as Roseman misrepresented.

72.    As an actual and proximate cause of these misrepresentations, Bobulinski has been damaged in an amount to be proven at trial.  Bobulinski has suffered damages in an amount of $650,000 – the principal amount of the Note, which he has lost and has been unable to recover[3].  Bobulinski has also suffered financial damages due to the legal fees and costs he incurred litigating the Cayman Litigation for nearly two and a half years – over $700,000.  Finally, Bobulinski has also suffered financial lost opportunity damages based on the difference between the value of his actual share in Investment Company and the value of what his share would have been had been able to invest the full amount of money he had originally earmarked, but which was eventually used for CBG.

---

[3] To the extent that the Cayman Liquidation is ongoing, the fact remains that it is highly unlikely that Bobulinski will ever recover his $650,000 or any part of it given the multitude of creditor claims CBG is facing and CBG's current insolvency.  Furthermore, the JOLs are now claiming that Bobulinski must pay their legal fees amounting to $634,393.52.  Therefore, even in the unlikely event that Bobulinski recovered any amount, it would undoubtedly be reduced to satisfy the JOLs' fees.

73.    Bobulinski, alternatively, seeks rescission of the Note and the Pledge Agreement.  Bobulinski is entitled to a rescission of the Note and the Pledge Agreement, which should both be declared void based on Roseman's fraudulent misrepresentations.  Bobulinski is also entitled to an order requiring Roseman to restore Bobulinski to the pre-contractual status quo.  Such an order should require Roseman to return Bobulinski's $650,000 and pay all costs incurred as a consequence of Bobulinski signing the Note and Pledge, including but not limited to, all attorneys' fees incurred in connection with the Cayman Litigation.

74.    Bobulinski is informed and believes, and on that basis alleges, that Roseman engaged in the conduct described above with fraudulent intent, and with a conscious or reckless disregard for Bobulinski's rights and welfare.  Roseman thereby acted toward Bobulinski with malice, oppression, and fraud. Accordingly, Bobulinski is entitled to an award of punitive and exemplary damages against Roseman in an amount sufficient to punish and make an example of Roseman and to deter him and others similarly situated from engaging in similar wrongful conduct in the future.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation against all defendants)

75.    Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

76.    As the CEO of CBG, Roseman was or should have been kept apprised of all assets owned by CBG.  And as the sole member or manager of RAAD, Roseman knew or should have known that RAAD and CBG were separate entities and that RAAD owned those "license agreements" and "content library" which Bobulinski was led to believe would secure his Note. Roseman knew or should have known that inclusion of the terms "license agreements" and "content library" within the scope of the Collateral were misleading because those assets were owned by RAAD.

77.     Despite this, Roseman failed to inform Bobulinski of the misrepresentations contained in the Pledge.  Roseman never explained the Collateral was owned by RAAD or that RAAD was a separate entity from CBG.  As CEO of CBG and a member or manager of RAAD, Roseman had no reasonable grounds for believing the representations were true when he made them.

78.     Roseman's misrepresentations were essential to Bobulinski's decision to enter into the Note.  Bobulinski informed Roseman that a vital condition to providing a loan was that his loan needed to be senior secured by CBG's assets.  Bobulinski was then led to believe that CBG owned the "content library" and "license agreements" that would secure his loan.  Bobulinski would not have agreed to enter into the Note and the Pledge Agreement but for this agreement that the Note would be secured by the Collateral.  In reality, the Collateral, which Roseman led Bobulinski to believe was owned by CBG, was actually owned by RAAD.

79.     Bobulinski reasonably relied on such misrepresentations made by Roseman.  Bobulinski and Roseman had been business partners and friends for over 16 years.  And because Roseman was the CEO and founder of CBG, Bobulinski had reason to believe that Roseman had knowledge of CBG's assets and no reason to believe that Roseman's misrepresentations about the ownership of the Collateral were untrue.

80.     Roseman's misrepresentations about the Collateral are the actual and proximate cause of these damages because had Roseman been truthful about the true ownership of the Collateral, Bobulinski would not have entered into the Note.  And had Bobulinski not entered into the Note, there would have been no need for the Cayman Litigation on Bobulinski's Proof of Debt.  Furthermore, if Bobulinski had actually been secured by the Collateral, he would have had the contractual right to stop the Remark deal as the deal could not have closed without his signature, pursuant to Section 7 of the Pledge.  With this veto power, Bobulinski could have held up the Remark deal and received further assurance and confirmation that he was

getting his 2.5x return on the Note before the deal closed, which also would have rendered the Cayman Litigation unnecessary.  As it turned out, the Remark deal closed without his consent because CBG did not own the Collateral, as Roseman misrepresented.

81.     As a direct and proximate cause of Roseman's actions, Bobulinski has suffered damages in an amount to be proven at trial.  Bobulinski has suffered damages in an amount of $650,000 – the principal amount of the Note, which he has lost and has been unable to recover.  Bobulinski has also suffered financial damages due to the legal fees and costs he incurred litigating the Cayman Litigation for nearly two and a half years – over $700,000.  Finally, Bobulinski has also suffered financial lost opportunity damages based on the difference between the value of his actual share in Investment Company and the value of what his share would have been had he been able to invest the full amount of money he originally earmarked, but which was eventually loaned to CBG without recovery.

82.     Bobulinski is informed and believes, and based thereon alleges, Roseman's conduct was performed with a conscious disregard of Bobulinski's rights, such as to constitute oppression, fraud, or malice, thereby rendering Roseman liable for punitive damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty against all defendants)

83.     Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

84.     Roseman owed Bobulinski a fiduciary duty based on their long-standing professional relationship as business partners and close friends.  By virtue of their 16-year partnership, Roseman and Bobulinski formed a confidential relationship, which is synonymous with a fiduciary relationship in that it gives rise to fiduciary duties.  Roseman and Bobulinski's confidential relationship obligated Roseman to act with the utmost good faith for the benefit of Bobulinski in their business dealings.

85.     Over the course of their 16-year partnership, Bobulinski invested in a number of Roseman's businesses throughout that time period.  Roseman's solicitation of the loan from Bobulinski was not uncommon.  However, their relationship stretched beyond just their business dealings.  Having worked together for over a decade and a half, Roseman and Bobulinski had become close friends and confidants.  Because they had worked together so closely for such a long period of time, Bobulinski placed his trust and confidence in Roseman.

86.     Roseman breached his fiduciary duty to Bobulinski when he misrepresented CBG's ownership of the Collateral in order to secure a loan from the unknowing Bobulinski.  Because Roseman was the CEO and controlling member of CBG, he had superior knowledge than Bobulinski about what assets CBG actually owned.  Because Bobulinski had no reason to believe that the CEO of CBG, and his close friend, would lie about CBG's assets, Bobulinski placed his trust and confidence in Roseman when agreeing to enter into the Note.

87.     Because Roseman was much more knowledgeable about CBG and its assets, Bobulinski was placed in a vulnerable position resulting in Roseman's empowerment over Bobulinski during the solicitation and negotiation of the Note. *See Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1161 (2005) (describing the elements required for a confidential relationship).

88.     When Roseman solicited Bobulinski's financial assistance, Bobulinski was asked to urgently enter into a deal.  Because Roseman was desperate for funding and wanted to move quickly to secure a loan, Roseman assured Bobulinski that their understanding about his security interest would be properly documented by the law firm Sheppard Mullin, counsel for CBG, and recommended that Bobulinski not retain his own lawyer, as Roseman felt it would slow down the process of obtaining Bobulinski's loan.  Roseman assured Bobulinski that Sheppard Mullin would properly document the deal with both of their interests in mind.

89.    Because Bobulinski trusted his longtime friend and business partner, and because of the stated urgency of the needed loan, Bobulinski did not secure his own separate counsel to negotiate or review the terms of the purported security interest in CBG's assets.

90.    In sum, Roseman had superior knowledge about CBG's assets, made the decision to secure counsel to review and draft the terms of the Note while assuring Bobulinski that he need not retain his own counsel, and took advantage of his sixteen year business partnership with Bobulinski to induce Bobulinksi into entering into the Note quickly.  Roseman utilized his confidential relationship with Bobulinski to Bobulinski's detriment.  The "essence" of a confidential relationship is "that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *Richelle L. v. Roman Catholic Archbishop*, 106 Cal. App. 4th 257, 271 (2003).

91.    Roseman took advantage of Bobulinski's vulnerability by offering to take a loan on whatever terms Bobulinski asked for or needed to move quickly, knowing full well that neither he nor CBG could fulfill the terms Bobulinski requested.

92.    Yet, Roseman owed a fiduciary duty to Bobulinski to fully and frankly disclose all relevant information necessary for just, equitable and open dealings between the two business partners.  Roseman failed to fully disclose all material facts within his knowledge to Bobulinski about the Collateral and the purported security of the Note.  Roseman did not explain that the "license agreements" and "content library" which purportedly secured Bobulinski's Note were not actually owned by CBG; rather, they were owned by RAAD.  Had Roseman fully disclosed this information, Bobulinski would not have entered into the Note.

93.    Roseman knowingly undertook to act on behalf of Bobulinski and with Bobulinski's confidence and trust when he solicited Bobulinski for a loan to CBG.

Roseman abused that trust when he fraudulently misrepresented that CBG owned the Collateral.

94. Roseman's breach of his fiduciary duty to fully disclose all relevant information about the Collateral is the actual and proximate cause of these damages because, had Roseman been truthful about the true ownership of the Collateral, Bobulinski would not have entered into the Note. And, had Bobulinski not entered into the Note, there would have been no need for the Cayman Litigation on Bobulinski's Proof of Debt. Furthermore, if Bobulinski had actually been secured by the Collateral, he would have had the contractual right to stop the Remark deal as the deal could not have closed without his signature, pursuant to Section 7 of the Pledge. With this veto power, Bobulinski could have held up the Remark deal and received further assurance and confirmation that he was getting his 2.5x return on the Note before the deal closed, which also would have rendered the Cayman Litigation unnecessary. As it turned out, the Remark deal closed without his consent because CBG did not own the Collateral, as Roseman misrepresented.

95. As a direct and proximate cause of Roseman's breach of his fiduciary duty, Bobulinski has suffered damages in an amount to be proven at trial. Bobulinski has suffered damages in an amount of $650,000 – the principal amount of the Note, which he has lost and has been unable to recover. Bobulinski has also suffered financial damages due to the legal fees and costs he incurred litigating the Cayman Litigation for nearly two and a half years – over $700,000. Finally, Bobulinski has also suffered financial lost opportunity damages based on the difference between the value of his actual share in Investment Company and the value of what his share would have been had been able to invest the full amount of money he had originally earmarked, but which was eventually used for CBG.

96. Bobulinski is informed and believes, and based thereon alleges, Roseman's conduct was performed with a conscious disregard of Bobulinski's rights,

such as to constitute oppression, fraud, or malice, thereby rendering Roseman liable for punitive damages in an amount to be proven at trial.

## <u>PRAYER</u>

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    For actual and consequential damages to be proven at trial;

2.    Compensatory damages, in an amount to be proven at trial;

3.    For punitive and exemplary damages;

4.    In the alternative, rescission of the Note and Pledge Agreements as to Plaintiff's First Cause of Action;

5.    For costs of suit;

6.    For attorneys' fees as permitted by law; and

7.    For such other and further relief that this Court deems proper.


DATED  July 10, 2019                    BAKER MARQUART LLP


By: _____
          Ryan G. Baker
          Lucas Paule
          *Attorneys for Plaintiff*
          Tony Bobulinski

FIRST AMENDED COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff Tony Bobulinski hereby demands a jury trial of all claims, defenses and requests for relief in this matter for which there is a right to a jury trial.

DATED  July 10, 2019                    BAKER MARQUART LLP


By: _____
    Ryan G. Baker
    Lucas Paule
    *Attorneys for Plaintiff*
    Tony Bobulinski

FIRST AMENDED COMPLAINT